Slip Op. 15-52

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| US MAGNESIUM LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNITED STATES,<br><br>                    Defendant. | Before: Leo M. Gordon, Judge<br><br>Consol. Court No. 14-00038 |

**OPINION**

[Motion for judgment upon the agency record denied; final results of administrative review sustained.]

Dated: June 1, 2015

Stephen A. Jones and Jeffery B. Denning, King and Spalding of Washington, DC for Plaintiff US Magnesium LLC.

David A. Riggle and David J. Craven, Riggle and Craven of Chicago, Illinois for Plaintiff and Defendant-Intervenor Tianjin Magnesium Metal Co., Ltd.

Eric E. Laufgraben, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC for Defendant United States. With him on the brief were Joyce R. Branda, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Claudia Burke, Assistant Director. Of counsel on the brief was Aman Kakar, Attorney, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

Gordon, Judge: This action involves an administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering pure magnesium from the People's Republic of China. See Pure Magnesium From the People's Republic of China, 79 Fed. Reg. 94 (Dep't of Commerce Jan. 2, 2014) (final results admin. review) ("Final Results"); see also Issues and Decision Memorandum for

the Final Results of the Antidumping Duty Administrative Review on Pure Magnesium from the People's Republic of China, A-570-832 (Dep't of Commerce Dec. 26, 2013) ("Decision Memorandum"), available at http://enforcement.trade.gov/frn/summary/prc/2013-31412-1.pdf (last visited this date). Before the court is US Magnesium LLC's ("US Magnesium") motion for judgment on the agency record. See US Magnesium's R. 56.2 Br. in Support of Mot. for J. on the Agency R. (July 29, 2014), ECF No. 40 ("US Mag. Br."); see also Def.'s Opp. to Pl.'s and Def.-Intervenor's R. 56.2 Mots. for J. upon the Agency R. (Oct. 24, 2014), ECF No. 43; Resp. of Pl. Tianjin Magnesium Metal Co., Ltd., to the Mot. Pursuant to R. 56 of the Rs. of the U.S. Ct. of Int'l Trade by US Magnesium LLC (Nov. 14, 2014), ECF No. 47; US Magnesium's Reply to the Resps. of Def. and Def.-Intervenor (Dec. 15, 2014), ECF No. 55 ("US Mag. Reply").[1] The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[2] and 28 U.S.C. § 1581(c) (2012).

US Magnesium challenges (1) Commerce's financial statement selection, (2) Commerce's refusal to apply adverse facts available to Tianjin Magnesium Metal Co. Ltd. ("TMM"), and (3) Commerce's surrogate valuation of magnesium scrap. US Mag. Br.

---

[1] Tianjin Magnesium Metal Co. Ltd. raises several conditional arguments in its motion for judgment on the agency record, requesting judicial review if the court remands any of the issues raised by US Magnesium. Mem. in Support of the Mot. for J. on the Agency R. Submitted by Pl. Tianjin Magnesium Metal Co., Ltd., Pursuant to R. 56.2 of the Rs. of the U.S. Ct. of Int'l Trade 3-12 (July 10, 2014), ECF No. 33. Having not remanded any of US Magnesium's issues, the court does not address Tianjin Magnesium Metal Co. Ltd.'s motion.

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

at 5-39. For the reasons set forth below, the court sustains the Final Results on each of

the issues challenged by US Magnesium.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains

Commerce's "determinations, findings, or conclusions" unless they are "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings,

or conclusions for substantial evidence, the court assesses whether the agency action is

reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d

1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir.

2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial

evidence has also been described as "something less than the weight of the evidence,

and the possibility of drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's finding from being supported by substantial evidence."

Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though,

"substantial evidence" is best understood as a word formula connoting reasonableness

review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2015).

Therefore, when addressing a substantial evidence issue raised by a party, the court

analyzes whether the challenged agency action "was reasonable given the circumstances

presented by the whole record." 8A <u>West's Fed. Forms, National Courts</u> § 3:6 (5th ed. 2015).

## II. Discussion

### A. Financial Statement Selection

Commerce calculates dumping margins by determining "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A). In the non-market economy context, Commerce calculates normal value using data from surrogate countries to value the factors of production. <u>Id.</u> § 1677b(c)(1)(B). Commerce must use the "best available information" in selecting surrogate data from "one or more" surrogate market economy countries. <u>Id.</u> § 1677b(c)(1)(B), (4). The surrogate data must "to the extent possible" be from a market economy country or countries that are (1) "at a level of economic development comparable to that of the nonmarket economy country" and (2) "significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). Commerce has a stated regulatory preference to "normally . . . value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2) (2015). Commerce here chose the Philippines as the primary surrogate country. <u>Decision Memorandum</u> at 4-10.

Pursuant to its regulations, Commerce relies upon financial statements from surrogate producers of "identical or comparable merchandise" to determine surrogate values for manufacturing overhead, general expenses, and profit. 19 C.F.R. § 351.408(c)(4). Commerce's choice of financial statements is guided by a regulatory preference for publicly available information. <u>Id.</u> Beyond that, Commerce generally

considers the quality, specificity, and contemporaneity of the available financial statements. Issues and Decision Memorandum for the Final Results in the Antidumping Duty Administrative Review of Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China, A-570-924, at 4 (Dep't of Commerce Feb. 14, 2011), available at http://enforcement.trade.gov/frn/summary/prc/2011-3909-1.pdf (last visited this date).

In its preliminary determination Commerce used financial statements from two Philippine companies to calculate TMM's financial ratios: SOH Technologies Corp. and RU Foundry and Machine Shop Corporation ("RU Foundry"). Decision Memorandum for Preliminary Results of 2011-2012 Antidumping Administrative Review: Pure Magnesium from the People's Republic of China, A-570-832, at 20-21 (Dep't of Commerce May 31, 2013), available at http://enforcement.trade.gov/frn/summary/prc/2013-13702-1.pdf (last visited this date) ("Prelim. Decision Memorandum"). Commerce selected RU Foundry because US Magnesium "placed on the record a description of RU Foundry's line of work, which included production of aluminum, (considered to be a comparable production process to production of [the subject merchandise])." Decision Memorandum at 22.

TMM, however, argued in its administrative case brief that RU Foundry's financial statements indicated that RU Foundry did not in fact produce comparable merchandise. Decision Memorandum at 20-21. For the final results Commerce agreed, explaining that the revenue sources, raw material purchases, and accounts receivables section of the financial statement all suggest that RU Foundry manufactures beverages, and not metal as the "Foundry" in its name implies. Id. (noting that RU Foundry "derives its revenue from

'a range of beverage products'" and "selling fruits, juices, and copra products," that RU

Foundry's purchases do not include "raw materials for metal production," and that RU

Foundry's accounts receivables include companies like "'Eco Agri,' 'Puro Organic,' and

'Fresh Start'"). Confronted with financial statements containing "irreconcilable

contradictions as to what merchandise RU Foundry actually produces and sells,"

Commerce chose not to use the RU Foundry financial statements for the Final Results.

Decision Memorandum at 22. It is hard to fault that choice.

US Magnesium, nevertheless, challenges this decision. US Mag. Br. at 33-37. The

court is not persuaded by US Magnesium's argument. Even if the issue of RU Foundry's

business were arguable, and the record unclear, US Magnesium could not prevail

because the substantial evidence standard of review "contemplates [that] more than one

reasonable outcome is possible on a given administrative record." Globe Metallurgical,

Inc. v. United States, 36 CIT ___, ___, 865 F. Supp. 2d 1269, 1276 (2012). US

Magnesium fails to demonstrate that there is one and only one reasonable conclusion to

be drawn from RU Foundry's financial statement—that RU Foundry produces comparable

merchandise. The court therefore agrees with TMM and Defendant that Commerce's

rejection of RU Foundry's financial statement is reasonable on this administrative record.

Accordingly, the court sustains this aspect of the Final Results.

### B. Facts Available

The statute mandates that Commerce use "facts otherwise available" when

"necessary information is not available on the record" or when, among other things, an

interested party "significantly impedes a proceeding." 19 U.S.C. § 1677e(a). If Commerce

"finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce may "use an inference that is adverse" when selecting among facts available. Id. § 1677e(b). The use of "facts otherwise available" and the application of an adverse inference are separate determinations. Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1346 (Fed. Cir. 2011) (citing Nippon Steel v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003)).

US Magnesium argues that Commerce did not consider whether TMM significantly impeded the proceeding by failing to include a complete and accurate translation of a Ukrainian financial statement. US Mag. Br. at 5-26. During the proceeding US Magnesium placed on the record an alternative English translation of the same Ukrainian financial statement. Commerce, in turn, concluded that US Magnesium's alternative translation did not warrant a finding that TMM significantly impeded the proceeding:

> In this case, the information has been placed on the record, in the form of Petitioner's translation of the omitted paragraphs and, in any case, we do not consider the information at issue to qualify as "necessary information" given that the Department has selected the Philippines as the appropriate surrogate country. Because the information at issue is not necessary for the determination, and there are no other allegations or information that raise question as to the reliability of any other information provided by TMM in this particular review, we do not find that the party significantly impeded the proceeding based upon the facts in this case. Accordingly, we find no basis to apply facts available, and thus no basis to apply adverse inferences in this case.

Decision Memorandum at 26 (footnotes omitted) (emphasis added).

When US Magnesium argues that Commerce did not consider whether TMM significantly impeded the proceeding, see, US Magnesium Br. at 10; US Magnesium

Case 1:14-cv-00038-LMG   Document 60   Filed 06/01/15   Page 8 of 13

Consol. Court No. 14-00038                                    Page 8

Reply at 2, US Magnesium appears to have overlooked the underlined language above.

And despite devoting almost its entire administrative case brief arguing TMM deserved a

total AFA rate, US Magnesium could only identify three apparent discrepancies within a

single exhibit among the many submitted by TMM. See Case Br. of US Magnesium, at 1-

17 (Dep't of Commerce Aug. 8, 2013), PD 144.[3] All US Magnesium submitted to support

its argument was a competing translation of the same financial statement. Id.; see

Decision Memorandum at 26 ("The record does not contain . . . information to contradict

TMM's assertion that it provided an acceptable translation of the words.). Here,

Commerce reasonably declined US Magnesium's invitation to find that TMM significantly

impeded the proceedings. The court therefore sustains this aspect of the Final Results as

well.

### C. Surrogate Value for Magnesium Scrap

For the preliminary results Commerce selected Philippine HTS 8104.20

("Magnesium Waste and Scrap") to value TMM's scrap input. Prelim. Decision

Memorandum at 18-19 ("Philippine data for imports of magnesium scrap under HTS

subcategory 8104.20 represent the best, and only, information available to value the

scrap inputs used by TMM's supplier in the production of subject merchandise during the

POR."). In the final results, however, Commerce acknowledged that the selection of

Philippine data was no longer a reasonable choice on the administrative record.

---

[3] "PD" refers to a document contained in the public administrative record.

Commerce explained that TMM submitted "benchmark" data showing that the Philippine scrap surrogate data point exceeded the values of Indonesian, South African, Thai, and Colombian imports under HTS 8104.19, which covered the finished subject merchandise as well as the magnesium TMM used to produce its scrap. The Philippine scrap surrogate data point also exceeded the values of Indonesian, South African, and Thai imports for pure (99.8% or greater) unwrought magnesium under HTS 8104.11. Id. at 12-16. These "benchmark" prices rendered the Philippine scrap value unreasonable. According to Commerce, scrap should not be more valuable than both the subject merchandise and the material used to produce the scrap. Id. at 15. Without a usable surrogate value from the primary surrogate country (Philippines), Commerce applied its standard selection criteria (specificity, contemporaneity, public availability, representativeness, and whether prices exclude taxes and duties) to the other available secondary surrogate country data on the administrative record. Id. at 12-20; see also Surrogate Value Memorandum, at 2-4 (Dep't of Commerce Dec. 26, 2013), PD 165.

The administrative record included data from various countries under three HTS subheadings: HTS 8104.20 (covering scrap magnesium); HTS 8104.19 (covering subject merchandise and input that created TMM's scrap); HTS 8104.11 (covering pure magnesium). Commerce easily settled on HTS 8104.20 as best covering TMM's "scrap." Id. at 20.

Among the available secondary surrogate country-specific HTS 8104.20 data, Commerce rejected Thai and South African data points as non-contemporaneous and unreliable. Decision Memorandum at 18-19. For the remaining Serbian, Ukrainian, and

Bulgarian HTS 8104.20 data, Commerce explained that each were "publicly available, non-export, tax-exclusive, and obtained from the preferred GTA data-source," but that "the Serbian HTS 8104.20 import data provide the most robust dataset and, therefore, represent the best available information to value scrap magnesium." Id. at 20. Commerce's choice of Serbian HTS 8104.20 as the "best available" surrogate value on this administrative record represents a reasonable application of Commerce's surrogate value selection criteria.

US Magnesium does not challenge Commerce's rejection of the Philippine surrogate value as unreasonable when measured against the non-Philippine benchmark data. US Magnesium instead challenges Commerce's use of the Serbian HTS 8104.20 data point as an unreasonable departure from past practice. According to US Magnesium, once Commerce "established a benchmark" price, it should have also selected that benchmark price as the surrogate value, i.e., "cap" the scrap value at the benchmark price. US Mag. Br. at 27-31. Thus, US Magnesium argues that Commerce should have selected the Indonesian, South African, Thai, and Colombian HTS 8104.19 data points, either individually or in some combination. US Mag. Reply at 18-19.

Commerce acknowledged that its recent practice "is to continue to utilize the scrap value in question as the [surrogate value], but to cap this value at the price of the primary product." Decision Memorandum at 15. Commerce has not always applied a cap. See Issues and Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Certain Steel Nails from the People's Republic of China, A-570-909, at 38 (Dep't of Commerce June 6, 2008), available at

http://enforcement.trade.gov/download/nme-sep-rates/prc-nails/prc-nails-final-memo.pdf

(last visited this date). Where Commerce has applied a cap, it has not always selected

the benchmark for use as a cap. See Issues and Decision Memorandum for the Final

Results of the Antidumping Duty New Shipper Reviews on Certain Frozen Fish Fillets

from the Socialist Republic of Vietnam, A-552-801, at 35-37 (Dep't of Commerce June

24, 2013), available at http://enforcement.trade.gov/frn/summary/vietnam/2013-15882-

1.pdf (last visited this date) (using a benchmark to reject a proposed scrap surrogate

value, but constructing a cap value using different record data) ("Fish Filets").

        If Commerce does "cap" a surrogate scrap value, Commerce uses the cap value

in place of the unreasonable scrap surrogate value. See Issues and Decision

Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of

Multilayered Wood Flooring from the People's Republic of China, A-570-970, at 89 (Dep't

of        Commerce        Oct.        11,        2011),        available        at

http://enforcement.trade.gov/frn/summary/prc/2011-26932-1.pdf (last visited this date)

("valuing" respondent's scrap using an average of the surrogate values for the inputs used

to create the byproduct) ("Wood Flooring"); Decision Memorandum at 17 (describing the

scrap value in Wood Flooring as "cap"). Most important, when Commerce has applied a

cap, Commerce derived the cap value from the primary surrogate country price data for

the input that created the scrap. See Decision Memorandum at 17 (explaining when

Commerce has applied a cap).

        Here, there was no reasonable surrogate value from the primary surrogate country

from which Commerce could establish a cap. Commerce looked to the Philippine HTS

provision covering the input that created TMM's scrap (HTS 8104.19). During the period of review, however, the Philippines had no imports under HTS 8104.19 (the category covering the input that created the scrap), and there were no Philippine alternatives on the record. Id. at 15. As Commerce explained, "because the instant record lacks a value for finished unwrought magnesium from the Philippines from which an appropriate cap may be determined (i.e., Philippine price data for imports of HTS 8104.19), we are unable to cap the SV in question and must instead look to the other available SV information on the record." Id. This therefore is not a circumstance, as US Magnesium contends, in which Commerce unreasonably departed from past practice, but instead a circumstance in which Commerce attempted to identify the "best available information" for TMM's scrap surrogate given a lack of available usable data from the primary surrogate country. 19 U.S.C. § 1677b(c)(1).

US Magnesium also argues that Commerce failed to explain why imports under Serbian HTS 8104.20 are specific to TMM's scrap, which, according to US Magnesium, is a necessary finding because that provision is a basket category that may include imports of lower-quality and lower-priced scrap. US Mag. Br. at 31-33. Although everyone agrees that HTS 8104.20 covers TMM's scrap, US Magnesium infers that perhaps the Serbian scrap provision, as a basket category, might also contain non-comparable scrap, rendering it a poor surrogate value choice. Id. Perhaps it does, but this remains just one of many possible inferences that could be drawn about this tariff heading. See Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Technical, Salaried & Mach. Workers, AFL-CIO, 6 F.3d 1511, 1520 (Fed. Cir. 1993) ("The question is whether the record adequately

supports the decision of [Commerce], not whether some other inference could reasonably have been drawn."). If US Magnesium believed Serbian HTS 8104.20 was a poor choice, US Magnesium should have developed the administrative record with information substantiating its inference that the Serbian scrap provision contains lots of low-quality, non-comparable scrap. See QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("[T]he burden of creating an adequate record lies with [interested parties] and not with Commerce.").

As Commerce has provided a reasonable explanation for applying its standard selection criteria to the available secondary surrogate country data, as well as for declining to apply the benchmarks as a cap, the court sustains Commerce's selection of Serbian HTS 8104.20 to value TMM's scrap input.

### III. Conclusion

For the foregoing reasons, US Magnesium's motion for judgment on the agency record is denied. Judgment will be entered accordingly.

_____/s/ Leo M. Gordon___
Judge Leo M. Gordon

Dated: June 1, 2015
   New York, New York